**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

| | |
|---|---|
| SHEYANNE VAN MATRE individually and as parent and natural guardian of KENYANA BADDERS and KARTER VAN MATRE, decreased minors, <br><br> Plaintiff, <br><br> v. <br><br> UNITED STATES OF AMERICA, MUNCIE HOUSING AUTHORITY, <br><br> Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)    Case No. 1:24-cv-01030-TWP-TAB |

## ORDER ON SUMMARY JUDGMENT MOTIONS

Plaintiff Sheyanne Van Matre ("Van Matre") initiated this action after she and her children, Kenyana Badders and Karter Van Matre, suffered carbon monoxide poisoning in their rent-assisted home, resulting in the children's tragic passing. Van Matre asserts negligence claims against the United States of America (the "United States"), the Muncie Housing Authority, and Plenty of Room Indiana Master, LLC-S and Plenty of Room Indiana Master LLC-S Series 26:1717 E Yale Ave (together, "Plenty of Room"). This matter is before the Court on the United States' Motion to Dismiss and Alternative Motion for Summary Judgment (Filing No. 62), Muncie Housing Authority's Motion for Summary Judgment (Filing No. 65), Van Matre's Motion for Summary Judgment against Plenty of Room (Filing No. 67), Plenty of Room's embedded Cross-Motion for Summary Judgment (Filing No. 77), and Van Matre's Motion to Strike the Cross-Motion (Filing No. 80). For the following reasons, Van Matre's Motions and Plenty of Room's Cross-Motion are **denied as moot**, the United States' Motion is **granted**, and Muncie Housing Authority's Motion is **denied as moot** as the Court **relinquishes** supplemental jurisdiction over the state law claim.

## I.    BACKGROUND

The following facts are not necessarily objectively true, but as required when reviewing the United States' motion to dismiss, the Court accepts as true all factual allegations in the First Amended Complaint and draws all inferences in favor of Van Matre, *McCauley v. City of Chicago*, 671 F.3d 611, 616 (7th Cir. 2011), and as required by Federal Rule of Civil Procedure 56, the facts are presented in the light most favorable to the non-moving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009).

### A.    The Residence and Carbon Monoxide Poisoning Incident

In 2022, Van Matre rented a home in Muncie, Indiana (the "Residence") from landlord Plenty of Room under the Section 8 Housing Choice Voucher Program (the "Voucher Program") (Filing No. 68-4 at 44:17–45:6; Filing No. 68-7 at 13:8–24; Filing No. 68-8 at 1–4).[1] On May 28, 2023, Van Matre awoke in a stupor and found that her children Kenyana (age 1) and Karter (age 3) would not wake up. She was able to text her mother before passing out. Van Matre's mother arrived, pulled Van Matre out of the Residence, and called 911 (Filing No. 68-19 at 113:11–114:15, 117:3–118:10). When the fire department arrived, it found dangerously high levels of carbon monoxide in the Residence (Filing No. 68-1 at 15:25–18:21; Filing No. 68-2). Van Matre was transported to the hospital for carbon monoxide poisoning. Kenyana and Karter tragically died from carbon monoxide poisoning (Filing No. 68-3 at 4–12).[2]

### B.    The Voucher Program

Near the end of the Great Depression, Congress passed the United States Housing Act of 1937 (the "Housing Act"), to assist State and local governments in addressing the shortage of safe

---

[1] When citing deposition transcripts, the Court refers to deposition page numbers and not ECF page numbers.

[2] Van Matre's boyfriend, the father of her children, was also in the Residence at the time, and he too tragically passed away from carbon monoxide poisoning (Filing No. 48 ¶ 17).

and affordable housing for low-income families. 42 U.S.C. §§ 1437(a)–(b). One of those programs was the Voucher Program, which was created to help low-income families obtain "decent, safe and sanitary" homes in the private market through the use of rental vouchers. *Id.* §§ 1437f(a)–(b), (o).

The Voucher Program is funded and regulated by the United States Department of Housing and Urban Development ("HUD") but administered by public housing agencies. *Id.* § 1437a(6); *see* Ind. Code § 36-7-18-1. The Voucher Program's stated policy is to "vest in public housing agencies that perform well, the maximum amount of responsibility and flexibility in program administration, with appropriate accountability to public housing residents, localities, and the general public." 42 U.S.C. § 1437(a)(1)(C). The public housing authority performs the operational functions needed to administer the Voucher Program, including deciding eligibility, approving rental rates, making voucher payments to landlords, and inspecting units. *Id.* §§ 1437f(o)(6)–(8).

HUD provides public housing authorities with funding, standards, and guidance. *Id.* §§ 1437a(a)(8) & (b)(1)–(8), 1437f(a)–(b), (o). This guidance includes regulations for program administration, 24 C.F.R. Part 982 ("Part 982"). Under HUD's regulatory scheme, a public housing authority may issue a rental voucher to a qualifying tenant/family, who then selects a privately-owned unit to lease. If the housing authority finds that the proposed rent is fair in the market, it approves the tenancy and contracts with the private landlord to pay a portion of the tenant's rent; this contract is separate from the tenant's lease with the landlord. 24 C.F.R. §§ 982.1(a)–(b), 982.405(a)–(b); 42 U.S.C. § 1437f(o)(8). Before the tenancy starts, the public housing authority must perform and document an initial inspection to determine whether the unit meets HUD's Housing Quality Standards (discussed below) and perform periodic follow-up inspections. If the inspections reveal any deficiencies, the public housing authority must notify the landlord and may withhold payments if the deficiencies are not timely corrected. 24 C.F.R. §§ 982.404(d)(1),

982.405(j)(4). HUD retains authority to review a public housing authority's records related to the Voucher Program. 42 U.S.C. §§ 1435, 1437f(o)(8)(D)(iii); 24 C.F.R. § 982.158.

HUD's Housing Quality Standards set inspection performance and acceptability standards that public housing authorities enforce through the inspection process (Filing No. 62-1 at 46:16–47:14). The Housing Quality Standards at the time of the incident required, in part: "a safe system for heating the dwelling unit . . . in proper operating condition," 24 C.F.R. § 982.401(e)(2)(i) (2022); and that the unit "be free from dangerous levels of air pollution from carbon monoxide . . . and other harmful pollutants," *id.* § 982.401(h) (2022). These Housing Quality Standards do not instruct public housing authorities on how to check that the Standards are met. HUD expects that public housing authorities will conduct visual inspections of heating systems, because HUD has concluded that the most efficient way to check for carbon monoxide leakage is a visual inspection of the integrity of gas-burning appliances. HUD does not require public housing authorities to carry or use carbon monoxide testing equipment during inspections (Filing No. 62-1 at 41:15–42:21, 45:9–46:4, 48:14–49:17, 51:7–17, 55:1–56:23).

In December 2020, Congress amended the Housing Act to require each unit receiving Voucher Program funds to have a carbon monoxide alarm installed by December 27, 2022—just five months before the tragedy in this case. 42 U.S.C. § 1437f(o)(21). The public housing authority is required to communicate this requirement to the landlord and to check for devices during inspections (Filing No. 41-5 at 4, ¶ 10.a; Filing No. 62-1 at 65:16–66:12, 80:1–15). This carbon monoxide alarm requirement is not one of the Housing Quality Standards, 24 C.F.R. § 982.401 (2022), but HUD considers a violation of the statutory requirement to be the same as a Housing Quality Standards violation, and it expects that voucher payments will not be made for a unit that does not have a carbon monoxide alarm (Filing No. 62-1 at 66:6–12).

The Housing Act permits HUD to enter into Annual Contributions Contracts ("Contracts") with public housing authorities to administer the Voucher Program. 42 U.S.C. § 1437f(b). HUD and Muncie Housing Authority executed one such Contract, which outlines their respective responsibilities under the Voucher Program (Filing No. 41-5; Filing No. 62-3 at 4–19). Under the Contract, HUD sends federal funds to Muncie Housing Authority. The funds are earmarked for voucher payments and program administration costs, but Muncie Housing Authority has discretion in how it uses the funds. 24 C.F.R. § 982.151(a)(1); (Filing No. 41-5 at 3, ¶ 4(b); Filing No. 62-1 at 119:1–120:10). In exchange for the funds, Muncie Housing Authority must "comply, and must require [landlords] to comply, with the requirements of the [Housing Act] and all HUD regulations and other requirements, including any amendments or changes in the law or HUD requirements." (Filing No. 41-5 at 4, ¶ 10.a); 24 C.F.R. §§ 982.52, 982.153.

**C.      HUD Guidance and Oversight of the Voucher Program**

HUD issues Voucher Program Guidebooks to assist public housing authorities in their administration of the Voucher Program, including inspections (Filing No. 62-3 at 4, § 1-1). The Guidebook's only reference to carbon monoxide is a recitation of 24 C.F.R. § 982.401(h) (2022), which is the Housing Quality Standard about dangerous levels of harmful pollutants.[3] *Id.* at 31, § 10.3. The Guidebook also prohibits improper operating conditions for thermal appliances (*e.g.*, damaged vents) and refers public health authorities to local codes and offices for guidance. *Id.* at 28–29, § 10.3. HUD also provides inspection checklist forms to help facilitate inspections and to help public housing authorities interpret the Voucher Program's inspection regulations. Use of the forms is optional (Filing No. 62-1 at 49:11–17, 56:1–23; Filing No. 62-4).

---

[3] Specifically, the Guidebook only states: "The dwelling unit must be free from dangerous air pollution levels from carbon monoxide, sewer gas, fuel gas, dust, and other harmful pollutants. (Filing No. 62-1 at 31).

In addition, HUD issues periodic educational notices ("Notices") to public housing authorities about the Voucher Program. Some of the Notices contain information about the dangers of carbon monoxide and the statutorily required carbon monoxide alarm (Filing No. 62-5). HUD circulates the Notices and other Voucher Program information to public housing authorities through "e-mail blast" newsletters (Filing No. 62-1 at 28:9–29:17, 71:4–9). On August 4, 2022, and January 12, 2023, HUD emailed newsletters to the executive directors of public housing authorities; those newsletters referred to a Notice with information about carbon monoxide and the statutory carbon monoxide alarm requirement that became effective December 27, 2022 (Filing No. 62-6; Filing No. 62-7). On December 27, 2022 HUD also posted a message on one of its Twitter social media page about the statutory carbon monoxide alarm requirement (Filing No. 62-1 at 87:20–25; Filing No. 62-8).

HUD's oversight of the private-rental Voucher Program is much more "hands-off" than its oversight of its public housing programs. HUD prioritizes oversight of public housing units because they are funded directly through HUD grants and HUD itself inspects them. HUD's oversight priority with the Voucher Program, by contrast, is its financial operation, meaning that funds are properly disbursed and effectively spend; that there is no financial waste, fraud, or abuse; and that Housing Quality Standards inspections are being performed (Filing No. 62-1 at 20:16–21:18, 26:16–27:21, 121:13–122:5). HUD does not require its field officers to determine how each public housing authority conducts inspections to check for carbon monoxide, and because public housing authorities are required to comply with the Housing Quality Standards, HUD typically does not review inspection documents unless it receives a complaint about housing conditions. *Id.* at 27:22–28:8, 46:16–47:1, 84:22–85:2.

HUD gives public housing authorities broad discretion in administering the Voucher Program because HUD believes they are well suited "to find housing that meets the standards and house as many families as possible using the limited funds." *Id.* at 120:19–121:12. In making oversight decisions, HUD also considers the available resources and policy priorities of the given administration. *Id.* at 118:1–16. There are approximately 2.2 million units in the Voucher Program, and roughly 3,300 public housing authorities. *Id.* at 118:22–25. Given those numbers, HUD relies on the public housing authorities to enforce the Voucher Program requirements and oversee their own operations. *Id.* at 47:3–8, 84:22–95:2.

HUD field officers have routine communications with assigned public housing authorities (Filing No. 70-7 at 21:23–25:5). Evan Gant ("Gant"), an Indianapolis HUD field agent, was assigned to Muncie Housing Authority from 2022 to March 2023 (Filing No. 70-8 at 7:17–10:10). Gant held monthly meetings with Muncie Housing Authority personnel about changes in rules and regulations, including a meeting on December 28, 2022, the day after the statutory carbon monoxide alarm requirement went into effect. *Id.* at 10:11–11:6. However, none of the minutes for these meetings mentions the carbon monoxide alarm requirement, Gant does not recall mentioning it during these meetings, and he cannot explain why Muncie Housing Authority did not know about it. *Id.* at 22:2–23:11, 27:12–30:19, 37:7–40:2; (Filing No. 70-9; Filing No. 70-10).

HUD monitors the success of public housing authorities in meeting Voucher Program requirements and goals using a program-specific management program (the Section Eight Management Assessment Program, or SEMAP). That program uses several performance indicators, including tenant selection, rent calculations, and Housing Quality Standards inspections and enforcement. 24 C.F.R. §§ 985.1, 985.3. Public housing authorities track their own performance using these criteria and submit the information to HUD. Using the self-reported data,

HUD prepares a performance rating to determine whether a public housing authority is "troubled" or needs corrective action. *Id.* § 985.105; (Filing No. 62-1 at 22:19–24:4, 27:4–12, 122:6–13).

**D.      Muncie Housing Authority's Inspections of the Residence and Administration of the Voucher Program**

In December 2021, Van Matre was approved to participate in the Voucher Program and requested tenancy approval for the Residence located on Yale Avenue in Muncie, owned Plenty of Room. (Filing No. 65-3 ¶¶ 5, 7). Muncie Housing Authority's manager for the Voucher Program, Shannel Lampkins ("Lampkins"), reviewed Van Matre's request and then contacted Muncie Housing Authority's inspector, Melodie Norris ("Norris") to schedule an inspection of the Residence. Norris inspected the Residence in February 2022 and identified several deficiencies, none of which related to carbon monoxide. *Id.* ¶¶ 9–11. Plenty of Room cured the deficiencies, so Norris passed the Residence for habitability. *Id.* ¶¶ 11–12. Muncie Housing Authority and Plenty of Room entered into a Housing Assistance Payments contract, which provided that Plenty of Room must maintain the Residence in accordance with the Housing Quality Standards and that Muncie Housing Authority may declare Plenty of Room to be in breach if it fails to do so. *Id.* ¶¶ 13–14.

Norris returned to the Residence in November 2022 for a required periodic inspection. Norris visually checked the furnace and its exhaust pipes, but she did not notice any irregularities (Filing No. 68-11 at 60:5–22; Filing No. 65-9 at 73:3–7). Norris documented her inspection findings in a HUD form. The Residence passed the November 2022 inspection except for a defective smoke detector, which Plenty of Room corrected within twenty-four hours. (Filing No. 65-9 at 55:8–56:21, 65:1–20; Filing No. 65-3 ¶ 18). Norris was not supplied with, and did not use, any carbon monoxide measuring equipment during her February or November 2022 inspections (Filing No. 65-9 at 22:25–23:14).

Neither Lampkins nor Norris was aware of the statute (enacted two years earlier) requiring that carbon monoxide alarms be installed by December 27, 2022, and Lampkins does not recall seeing any emailed HUD Notices about the alarm requirement (Filing No. 65-3 ¶ 20; Filing No. 65-2 at 20:16–21:23, 23:18–25, 27:4–11; Filing No. 65-9 at 29:15–20, 53:15–18). Muncie Housing Authority's CEO, Joseph Anderson, likewise never received the HUD Notices because he had those emails automatically forwarded to the CFO, Jerri Hacker ("Hacker") (Filing No. 65-10 at 20:3–22:16). Hacker does not recall receiving the Notices, either, although she did receive an email from a consulting firm that mentioned the HUD Notice and alarm installation deadline (Filing No. 65-11 at 35:24–38:3, 40:13–42:1).

Due to Muncie Housing Authority's admitted, pervasive ignorance of the 2020 law requiring carbon monoxide alarms and the HUD Notices about the alarm requirement, Muncie Housing Authority took no action to enforce the law, and there was no carbon monoxide alarm installed in the Residence as of May 2023 (Filing No. 48 ¶ 18; Filing No. 65-3 ¶¶ 19–20). Lampkins attests that she did not gain actual knowledge of the carbon monoxide alarm requirement until late 2023 or early 2024—months after Van Matre's family was poisoned—and Lampkins did not notify landlords about the requirement until July 29, 2024—one month after Van Matre filed this lawsuit (Filing No. 65-3 ¶ 20).

E.     **Procedural History**

Van Matre initiated this federal action under 28 U.S.C. § 1331 against the United States, HUD, Muncie Housing Authority, and Plenty of Room in June 2024 (Filing No. 1). The United States and HUD moved to dismiss the original complaint's claims against them. Van Matre subsequently filed a Stipulation of Dismissal as to HUD and a First Amended Complaint, which is the operative pleading (Filing No. 48). The First Amended Complaint asserts negligence claims

against the United States, Muncie Housing Authority, and Plenty of Room. Muncie Housing Authority also filed cross-claims against Plenty of Room for breach of contract (Filing No. 51).

The instant motions followed. The United States moves for dismissal or alternatively summary judgment (Filing No. 62), Muncie Housing Authority moves for summary judgment (Filing No. 65), and Van Matre moves for summary judgment as to her claims against Plenty of Room (Filing No. 67). Plenty of Room's response (Filing No. 77) contains an embedded Cross-Motion for Summary Judgment, and Van Matre has filed a motion to strike that Cross-Motion as untimely (Filing No. 80). While these motions were pending, the parties jointly stipulated to the dismissal of all claims and cross-claims against Plenty of Room with prejudice, leaving only Van Matre's claims against the United States and Muncie Housing Authority (Filing No. 94; Filing No. 102). The remaining motions are now ripe for the Court's review.

## II.    LEGAL STANDARDS

### A.    Motion to Dismiss under Rule 12(b)(1)

A motion to dismiss under Rule 12(b)(1) challenges the court's subject matter jurisdiction. Fed. R. Civ. P. 12(b)(1). The burden of proof is on the plaintiff, the party asserting jurisdiction. *United Phosphorus, Ltd. v. Angus Chem. Co.*, 322 F.3d 942, 946 (7th Cir. 2003), *overruled on other grounds by Minn-Chem, Inc. v. Agrium, Inc.*, 683 F.3d 845 (7th Cir. 2012) (en banc). "The plaintiff has the burden of supporting the jurisdictional allegations of the complaint by competent proof." *Int'l Harvester Co. v. Deere & Co.*, 623 F.2d 1207, 1210 (7th Cir. 1980). "In deciding whether the plaintiff has carried this burden, the court must look to the state of affairs as of the filing of the complaint; a justiciable controversy must have existed at that time." *Id.*

"When ruling on a motion to dismiss for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1), the district court must accept as true all well-pleaded factual allegations, and draw reasonable inferences in favor of the plaintiff." *Ezekiel v. Michel*, 66 F.3d

10

894, 897 (7th Cir. 1995) (citation omitted). Further, "the district court may properly look beyond the jurisdictional allegations of the complaint and view whatever evidence has been submitted on the issue to determine whether in fact subject matter jurisdiction exists." *Id.* (citation modified).

**B.** **Motion for Summary Judgment under Rule 56**

The purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Federal Rule of Civil Procedure 56 provides that summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Hemsworth v. Quotesmith.com, Inc.*, 476 F.3d 487, 489–90 (7th Cir. 2007). In ruling on a motion for summary judgment, the court reviews "the record in the light most favorable to the nonmoving party and draw[s] all reasonable inferences in that party's favor." *Zerante*, 555 F.3d at 584 (citation omitted). "However, inferences that are supported by only speculation or conjecture will not defeat a summary judgment motion." *Dorsey v. Morgan Stanley*, 507 F.3d 624, 627 (7th Cir. 2007) (citation modified). Additionally, "[a] party who bears the burden of proof on a particular issue may not rest on its pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires trial." *Hemsworth*, 476 F.3d at 490 (citation omitted). "The opposing party cannot meet this burden with conclusory statements or speculation but only with appropriate citations to relevant admissible evidence." *Sink v. Knox Cnty. Hosp.*, 900 F. Supp. 1065, 1072 (S.D. Ind. 1995) (citations omitted).

"In much the same way that a court is not required to scour the record in search of evidence to defeat a motion for summary judgment, nor is it permitted to conduct a paper trial on the merits of [the] claim." *Ritchie v. Glidden Co.*, 242 F.3d 713, 723 (7th Cir. 2001) (citation modified).

11

"Neither the mere existence of some alleged factual dispute between the parties nor the existence of some metaphysical doubt as to the material facts is sufficient to defeat a motion for summary judgment." *Chiaramonte v. Fashion Bed Grp., Inc.*, 129 F.3d 391, 395 (7th Cir. 1997) (citation modified).

### III.    DISCUSSION

The Amended Complaint arises from a poisoning event that occurred on May 28, 2023 at Van Matre's residence in Muncie, Indiana, in which she, her two children, and the father of the children were overcome by the presence of high levels of carbon monoxide in the home. Tragically, the poisoning event resulted in the deaths of the two children and their father, and personal injuries to Van Matre. Several dispositive motions have been filed. The Court will first briefly address Van Matre and Plenty of Room's summary judgment motions before turning to the United States' Motion to Dismiss and Alternative Motion for Summary Judgment. Then, because Van Matre's claims against the United States are the basis for the Court's federal question jurisdiction, the Court will discuss whether it should retain supplemental jurisdiction over Van Matre's negligence claims against the Muncie Housing Authority.

#### A.    Van Matre and Plenty of Room's Motions

After Van Matre and Plenty of Room filed their cross-motions for summary judgment, the parties stipulated to the dismissal of all claims against Plenty of Room (Filing No. 94; Filing No. 102). Van Matre's Motion for Summary Judgment (Filing No. 67), Plenty of Room's Cross-Motion (Filing No. 77), and Van Matre's Motion to Strike (Filing No. 80) are therefore **denied as moot**.

#### B.    United States' Motion to Dismiss or for Summary Judgment

Van Matre asserts negligence claims against the United States under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b), 2671–80. "The FTCA allows those injured by federal employees to sue the United States for damages. The statute achieves that end by waiving, in 28

U.S.C. § 1346(b), the federal government's sovereign immunity for 'certain torts committed by federal employees acting within the scope of their employment.'" *Martin v. United States*, 605 U.S. 395, 400 (2025) (citing *Brownback v. King*, 592 U.S. 209, 212 (2021)); *see Couch v. United States*, 694 F.3d 852, 856 (7th Cir. 2012). However, the FTCA's immunity waiver is subject to several exceptions, including the discretionary-function exception, which bars "[a]ny claim" based on the exercise of an official's "discretionary function or duty . . . whether or not the discretion involved be abused." 28 U.S.C. § 2680(a).

"[I]f any of the plaintiff's claims survive the discretionary-function exception and thus fall within the FTCA's waiver of sovereign immunity, courts turn to a third question: Is the government liable to the plaintiff on the merits?" *Martin*, 605 U.S. at 402. The United States is liable only if a "private person under like circumstances" would be liable under "the law of the place" where the governmental employee's wrongful "act or omission occurred." 28 U.S.C. § 1346(b)(1). "Ordinarily, then, courts will find for the plaintiff if [s]he can demonstrate that federal officials committed a tort under applicable state law." *Martin*, 605 U.S. at 402 (citing *Brownback*, 592 U.S. at 218). Because "all elements of a meritorious [FTCA] claim are also jurisdictional," a finding that the plaintiff's claim fails on the merits also deprives the court of subject matter jurisdiction. *Brownback*, 592 U.S. at 217.

The United States contends that the discretionary-function exception applies here, that Van Matre cannot show liability under applicable Indiana law, and that Van Matre's claims are based on conduct that the United States delegated to an independent contractor, the Muncie Housing Authority (Filing No. 63 at 7–8). For each of these reasons, the United States argues, sovereign immunity is not waived, and Van Matre's claims against it must be dismissed for lack of subject matter jurisdiction. The Court will address these arguments in turn.

### 1.  **Discretionary-Function Exception to Waiver**

The discretionary-function exception maintains sovereign immunity for "[a]ny claim . . . based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." 28 U.S.C. § 2680(a). The exception is an affirmative defense that the United States must plead and prove. *Keller v. United States*, 771 F.3d 1021, 1023 (7th Cir. 2014). To support the application of this exception, the United States must offer evidence that shows beyond reasonable dispute that its conduct was shielded by the exception. *Id.* The exception serves to "prevent judicial 'second-guessing' of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort." *United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines)*, 467 U.S. 797, 814 (1984).

The discretionary-function exception has two elements. *Calderon v. United States*, 123 F.3d 947, 949 (7th Cir. 1997). "First, a discretionary act must be involved. In other words, the act for which liability is sought to be imposed must involve 'an element of judgment or choice.'" *Id.* (quoting *United States v. Gaubert*, 499 U.S. 315, 322 (1991)). Second, "'even assuming the challenged conduct involves an element of judgment," the judgment must be "of the kind that the discretionary function exception was designed to shield.'" *Id.* (quoting *Gaubert*, 499 U.S. at 322).

The United States argues that both requirements are met. As to the first element, the United States argues no federal statute, regulation, or policy requires HUD to provide or require the use of carbon monoxide testing equipment, requires that HUD check that Voucher Program units contained carbon monoxide alarms, or proscribes how HUD must educate or communicate with public housing authorities (Filing No. 25–31). As to the second element, the United States argues that each of its decisions involved policy considerations. Its decision not to provide or require the use of testing equipment involves a consideration of resource allocation and the balance between

14

economic and safety factors; its decision regarding the extent of its enforcement actions for the carbon monoxide alarm requirement involves a consideration of its role in the Voucher Program, resource allocation, cost savings achieved through delegation to public housing authorities, and public housing authorities' performance; and its decisions regarding oversight and training of public housing authorities takes into account the stated goals of the Voucher Program including vesting public housing authorities with "maximum responsibility and flexibility," providing cost-effective assistance to the most families possible, and HUD's primary role on maintaining financial oversight.

Van Matre raises three arguments in response. First, the only way to confirm the presence of a colorless, odorless, and tasteless gas like carbon monoxide is with testing equipment, so the decision whether to provide testing equipment is not discretionary and is purely operational (Filing No. 70 at 27–28).[4] Second, Van Matre criticizes HUD's determination that visual inspections are "the most efficient way to check for carbon monoxide exposure risks," since carbon monoxide is invisible. *Id.* at 28. Van Matre similarly argues that HUD has provided no evidence that it actually weighed any policy considerations in deciding not to provide or require carbon monoxide testing equipment; to the contrary, when comparing the cost of testing equipment to the enormous amount of funds committed to carbon monoxide safety efforts, the United States cannot be said to have based its decision on policy considerations. *Id.* at 28–29. Third, Van Matre argues that HUD had a non-discretionary duty to communicate information about the carbon monoxide alarm requirement to public housing authorities, and "[s]imply performing a mass email and burying some items on

---

[4] Van Matre likens this case to *Indian Towing v. United States*, 350 U.S. 61 (1955) and *Coats v. Luedtke Engineering Co.*, 744 F. Supp. 884 (E.D. Wis. 1990), which both held that the maintenance of a thing the United States decided to operate/build (a lighthouse in *Indian Towing*, and stairs in *Coats*) did not involve the exercise of judgment protected the discretionary-function exception (Filing No. 70 at 27–28). In this case, though, the United States did not undertake to ensure landlords' compliance with the Housing Quality Standards or carbon monoxide alarm requirement. Those duties were delegated to public housing authorities. *See Cassens v. St. Louis River Cruise Lines, Inc.*, 44 F.3d 508, 510 n.2 (7th Cir. 1995). The United States merely set the Standards and set the extent of its enforcement role.

a government website, without providing any verbal communication . . . could be considered by some as negligent on an operational level." *Id.* at 29–30.

On reply, the United States contends that Van Matre is focusing on whether HUD abused its discretion, which is not relevant to the discretionary-function analysis. The Court agrees. The exception applies when a discretionary act and an element of judgment or choice are involved, "whether or not the discretion involved be abused." 28 U.S.C. § 2680(a). HUD's alleged conduct (settling on visual inspections as the most efficient method of identifying carbon monoxide risks, deciding the extent to which it will enforce the carbon monoxide alarm requirement, and deciding how to communicate with public housing authorities) are not prescribed by Congress and require the exercise of HUD's judgment.

Additionally, "[t]hose things plaintiff[] wish[es] were done"—the provision or requirement of carbon monoxide testing equipment for unit inspections and direct and/or verbal communication by HUD to public housing agencies about carbon monoxide safety requirements—"are susceptible to policy analysis." *Maas v. United States*, 94 F.3d 291, 297 (7th Cir. 1996). HUD's conduct is the type of discretionary function excepted from the FTCA, regardless of whether HUD abused its discretion, and regardless of whether HUD actually weighed these policy considerations in reaching its decisions. "The focus of the inquiry is not on the [agency's] subjective intent in exercising the discretion conferred by statute or regulation, but on the nature of the actions taken and on whether they are susceptible to policy analysis." *Gaubert*, 499 U.S. at 325; *see Grammatico v. United States*, 109 F.3d 1198, 1203 (7th Cir. 1997) ("Once a discretionary function has been identified . . . the government may not be held liable for its negligence in carrying out the discretionary act . . . ."). The discretionary-function exception bars Van Matre's claims against the United States.

Because the FTCA does not waive the United States' sovereign immunity as to Van Matre's claims, they must be dismissed, and the Court may end its inquiry here. However, in the interest of thoroughness, the Court will also discuss the United States' two merits-based arguments.

**2.  Liability under Indiana Law**

The United States also argues that Van Matre cannot show that the United States would be liable under Indiana law. The FTCA waives sovereign immunity only "under circumstances where . . . a private person . . . would be liable" under applicable state tort law. 28 U.S.C. § 1346(b)(1). To succeed on her FTCA negligence claims, then, Van Matre must satisfy Indiana tort law by showing: (1) a duty owed to the plaintiff by the defendant; (2) the defendant's breach of the duty by failing to meet the appropriate standard of care; and (3) injury to the plaintiff caused by the defendant's failure to perform its duty. *See Iglesias v. Wells*, 441 N.E.2d 1017, 1019 (Ind. App. Ct. 1982) (citing *Miller v. Griesel*, 308 N.E.2d 701, 706 (Ind. 1974)).

The United States focuses on the first element—a duty owed by the United States to Van Matre. The United States contends that Van Matre's claims are based solely on duties arising under federal law, and there is no analogous state law duty. Van Matre raises two arguments in response. First, she argues that HUD's Housing Quality Standards mirror the safety requirements in Indiana's landlord-tenant laws. Ind. Code § 32-31-8-5 (Filing No. 70 at 18–20). The United States replies that a private individual in like circumstances would not be liable under these landlord-tenant laws because the United States was not Van Matre's landlord; Plenty of Room was. Moreover, HUD's role in the Voucher Program was "limited to providing funding, regulation, and guidance" to the Muncie Housing Authority, which was responsible for ensuring compliance with relevant safety standards (Filing No. 73 at 7–8). Although HUD's safety regulations are analogous to the safety requirements under Indiana's landlord-tenant laws, the Court agrees with the United States that it is not comparable to a landlord under the facts of this case. A private person in like circumstances

17

to the United States—as opposed to the Muncie Housing Authority or Plenty of Room—would not owe a duty of care, or be liable, to Van Matre under Indiana's landlord-tenant laws.

Second, Van Matre argues that the United States is liable for breaching an assumed duty of care, which the United States assumed by affirmatively implementing regulations to make Voucher Program homes safer (Filing No. 70 at 18–19). Under Indiana law, a party may voluntarily or gratuitously assume a duty of care through "affirmative, deliberate conduct." *Yost v. Wabash Coll.*, 3 N.E.3d 509, 517 (Ind. 2014). In defining breach of an assumed duty, Indiana courts look to the Restatement (Third) of Torts: "[a]n actor who undertakes to render services to another and who knows or should know that the services will reduce the risk of physical harm to the other has a duty of reasonable care to the other in conducting the undertaking [in certain circumstances]." *Id.* (quoting Restatement (Third) of Torts: Physical and Emotional Harm § 42 (2012)). "Liability attaches only for the failure to exercise reasonable care in conducting the 'undertaking.'" *Id.*

The Indiana Supreme Court declined to find an assumed duty of care under comparable circumstances in *Yost v. Wabash College*, 3 N.E.3d 509 (Ind. 2014). In that case, the plaintiff was injured during a hazing incident at the local chapter of his fraternity at Wabash College. *Id.* at 513. The plaintiff brought various claims against several defendants; this summary focuses on only the relevant parties, claims, and arguments. The plaintiff sued Wabash College and his national fraternity for negligence. The defendants moved for summary judgment, arguing that they did not owe a duty to protect the plaintiff from other defendants' alleged negligence. The plaintiff responded that Wabash and the national fraternity had breached an assumed duty to supervise and regulate the behavior of fraternities, and an assumed duty to prohibit and prevent hazing, respectively. *Id.* at 514–15, 520. In support, the plaintiff pointed to Wabash's strict policy against hazing and student behavior guide, as well as the national fraternity's promotional materials

disapproving of hazing and educational programming about the dangers of hazing. *Id.* The trial court granted summary judgment in favor of both defendants, and the Indiana Supreme Court affirmed. The court explained that while both defendants took steps to prevent hazing, neither defendant assumed a duty of care to protect the plaintiff from hazing:

> [W]hile Wabash does instruct the local fraternities to abide by the rules of the college and their national fraternal organizations, Wabash does not directly oversee the daily activities or organized events of any of the fraternities. . . . [T]he specific "undertaking" did not extend to direct oversight and control of the behavior of individual student members of the local fraternity. . . .
>
> With respect to [the national fraternity], . . . our analysis parallels our discussion as to Wabash. . . . [T]he national fraternity engaged in educational outreach programs to enhance proper behavior and to discourage hazing. But the specific undertaking did not extend to actual oversight and control over the behavior of individual student members of the local fraternity.

*Id.*

Here, the United States' alleged undertaking is the promulgation of safety regulations to make Voucher Program homes safer (Filing No. 70 at 23–24). Van Matre's claims are not based on the promulgation or substance of the regulations. They are based on an alleged failure to adhere to (and require adherence to) those regulations. But the United States, like the college and national fraternity in *Yost*, did not undertake to ensure that Voucher Program units comply with Housing Quality Standards (or carbon monoxide alarm laws), inspect units, or direct how public housing authorities inspect units or ensure compliance. *Cf. Yost*, 3 N.E.3d at 523 (reversing summary judgment for *local* fraternity chapter because evidence did not preclude a finding that the chapter assumed a duty to render supervisory services and reduce risk of harm to fraternity members); *Dalessio v. U.S. Dep't of Hous. & Urban Dev.*, 528 F. Supp. 3d 341, 347–48 (E.D. Pa. 2021) (rejecting plaintiff's argument that HUD was negligent in its repair/maintenance of sidewalk that it owned because the evidence showed that HUD had contracted the repair/maintenance responsibilities to a contractor and did not control the "day-to-day activities" of the contractor);

19

*see also Davis v. Sellas*, 580 F. App'x 467, 468 (7th Cir. 2013) ("[T]he statute requires the federal agency only to establish 'housing quality standards' and the local housing authority to conduct inspections so that the unit is maintained according to those standards."). Based on the undisputed material facts, no reasonable jury could find that a private individual in like circumstances would be liable to Van Matre under Indiana law for breaching an assumed duty of care.

Absent a basis for state law negligence liability against the United States, the FTCA does not waive sovereign immunity for Van Matre's claims. For this additional and independent reason, Van Matre's claims against the United States must be dismissed.

**3.    Negligence of Independent Contractor**

Lastly, the United States argues that it may not be held liable for the negligence of its independent contractor, the Muncie Housing Authority (Filing No. 63 at 21–23). The FTCA requires a plaintiff to show that her injury was caused by an "employee of the Government," which is defined to include officers, employees, and persons acting on behalf of any "federal agency." 28 U.S.C. § 2671. The FTCA's definition of "federal agency" excludes "any contractor with the United States." *Id.* The United States notes that, "a district court lacks jurisdiction over claims in which the alleged injury was caused by the negligence of an independent contractor." (Filing No. 63 at 21 (citing *Talignani v. United States*, 26 F.4th at 381; *Alinsky v. United States*, 415 F.3d 639, 645 (7th Cir. 2005)).

In her response, Van Matre confirms she "is not alleging that the United States is vicariously liable for any alleged negligence of the [Muncie Housing Authority] personnel." (Filing No. 70 at 20–21). She otherwise does not respond to the United States' argument, and any opposition is waived. *See, e.g.*, *Crothersville Lighthouse Tabernacle Church, Inc. v. Church Mut. Ins. Co.*, 168 F.4th 483, 490 (7th Cir. 2026) (discussing waiver); *Nichols v. Mich. City Plant Plan. Dep't*, 755 F.3d 594, 600 (7th Cir. 2014) ("The non-moving party waives any arguments . . . not

raised in its response to the moving party's motion for summary judgment."); *Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 466 (7th Cir. 2010) ("Failure to respond to an argument . . . results in waiver," and "silence leaves us to conclude" a concession.). The United States' position is well supported by evidence and caselaw, and the Court agrees that Van Matre cannot assert an FTCA claim against the United States based on the Muncie Housing Authority's negligence.

Because Van Matre cannot establish an FTCA claim against the United States based on its own negligence or the negligence of the Muncie Housing Authority, the United States' is **granted**, and Van Matre's claims against the United States are **dismissed without prejudice** for lack of subject matter jurisdiction.

**C.** **Supplemental Jurisdiction and Muncie Housing Authority's Motion for Summary Judgment**

As noted in Muncie Housing Authority's Motion, the Court has only supplemental jurisdiction over Van Matre's negligence claims against it. (Filing No. 66 at 5; Filing No. 48 ¶ 13); 28 U.S.C. § 1367. Because Van Matre's claims against the United States are dismissed, the Court must decide whether it is appropriate to continue to exercise supplemental jurisdiction over her remaining negligence claims. The Court has discretion whether to exercise supplemental jurisdiction over a plaintiff's state law claims. *Carlsbad Tech., Inc. v. HIF Bio, Inc.*, 556 U.S. 635, 639 (2009); *see* 28 U.S.C. § 1367(c) ("The district courts may decline to exercise supplemental jurisdiction over a claim . . . if . . . the district court has dismissed all claims over which it has original jurisdiction . . . ."). When deciding whether to exercise supplemental jurisdiction, "'a federal court should consider and weigh in each case, and at every stage of the litigation, the values of judicial economy, convenience, fairness, and comity.'" *City of Chi. v. Int'l Coll. of Surgeons*, 522 U.S. 156, 173 (1997) (quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988)).

"Normally, when all federal claims are dismissed before trial, the district court should relinquish jurisdiction over pendent state-law claims rather than resolving them on the merits." *Sharp Elecs. v. Metro. Life Ins.*, 578 F.3d 505, 514 (7th Cir. 2009) (citation and quotation marks omitted). Exceptions to the general rule exist: "(1) when the statute of limitations has run on the pendent claim, precluding the filing of a separate suit in state court; (2) substantial judicial resources have already been committed, so that sending the case to another court will cause a substantial duplication of effort; or (3) when it is absolutely clear how the pendent claims can be decided." *Davis v. Cook Cnty.*, 534 F.3d 650, 654 (7th Cir. 2008) (internal quotation omitted).

The Court finds that none of the exceptions applies to Van Matre's state law claims, and the Court sees no reason to deviate from the "usual practice" of relinquishing supplemental jurisdiction over state law claims. *Groce v. Eli Lilly & Co.*, 193 F.3d 496, 501 (7th Cir. 1999).

First, Van Matre is not prevented from refiling her claims in state court by the statute of limitations, because it is tolled while the case is pending in federal court. *See* 28 U.S.C. § 1367(d); *see also Artis v. Dist. of Columbia*, 583 U.S. 71, 74–75 (2018).

Second, the Court does not believe that relinquishment of jurisdiction will result in a substantial duplication of effort. Even though this case has been pending for approximately twenty-two months, the Court has not expended significant resources on the pending state law claims. This case has had relatively little pretrial activity, and the Court has not yet ruled on any other substantive or dispositive motions. *See RWL Mgmt. Co., Inc. v. BP Prods. of N. Am., Inc.*, 672 F.3d 476, 480–81 (7th Cir. 2012) (affirming district court order relinquishing supplemental jurisdiction even though case had been pending in federal court for over fifteen months, and district court had "held 35 hearings, considered 70 motions, and issued 45 orders," one of which was substantive). Further, the parties' discovery can be duplicated in state court with relative ease.

22

Third, it is not absolutely clear how the pendent negligence claims should be decided. Muncie Housing Authority argues that it is entitled to immunity under the enforcement-of-laws and negligent-inspection provisions of the Indiana Tort Claims Act ("ITCA"), Ind. Code §§ 34-13-3-3(a)(8), (a)(12), that Van Matre's claims are preempted and barred by 24 C.F.R. § 982.407 (formerly § 982.406 (2015)), and that it did not owe any common law duty of care to Van Matre. It is not clear whether any of these defenses bars some or all of Van Matre's claims. *See Sandifar v. Patterson*, 255 N.E.3d 1190, 1196–98 (Ind. Ct. App. 2025) (holding that a government entity is not entitled to immunity under the ITCA's enforcement-of-laws provision for claims arising from its own failure to abide by the law); *Craig v. Cornerstone Trading Grp., LLC*, No. 23-cv-1575, 2026 WL 847722, at *20 (S.D. Ind. Mar. 27, 2026) (applying Indiana law; finding that ITCA's negligent-inspection immunity did not bar plaintiffs' claims arising from city's alleged failure to abate a known fire hazard); 24 C.F.R. § 982.401 (2022) (not listing installation of a carbon monoxide alarm as a Housing Quality Standard); *Hous. Auth. of City of South Bend v. Grady*, 815 N.E.2d 151 (adjudicating claim by roommate of Voucher Program tenant and finding that public housing authority owed no duty of care to roommate; not addressing ITCA immunities).

And lastly, as always, comity favors allowing state courts to decide issues of state law. The remaining negligence claims are hornbook state law claims between an Indiana citizen and an Indiana municipal entity. The claims raise important and unsettled questions about the application of ITCA immunities and about the common law duties, if any, owed by municipalities to citizens like Van Matre. Moreover, the few courts that have considered these issues (or similar ones) are Indiana state courts. These quintessential state law issues are best resolved by state courts. This consideration weighs strongly in favor of remand. *See* 28 U.S.C. § 1367(c)(1) ("The district courts may decline to exercise supplemental jurisdiction over a claim . . . if . . . the claim raises a novel

23

or complex issue of State law . . . ."). On this point, the Seventh Circuit's decision in *Wentzka v. Gellman*, 991 F.2d 423 (7th Cir. 1993), is particularly instructive, holding that a district court *abused its discretion* by retaining jurisdiction over a case where state law was unsettled. *Id.* at 425 ("Nor have we found any other extraordinary circumstances which would lead us to believe that the retention of jurisdiction was necessary in this instance. To the contrary, we can identify one very good reason why the district should not have reached the merits of plaintiffs' commonlaw misrepresentation claims . . . the unsettled nature of Wisconsin law in the area of justifiable reliance."). In other words, the questions at issue are not the type of "no brainers" that would compel this Court to retain jurisdiction. *See Martin v. Ind. State Police*, 537 F.Supp.2d 974, 989 (S.D. Ind. 2008) (stating that unless remaining state claims are "no brainers," the "court's duty of comity toward Indiana courts in developing Indiana law directs the court to remand all state law claims to the state courts").

In sum, the application of the *Carnegie-Mellon* factors, coupled with the presumption of relinquishment, leads to the conclusion that the Court should relinquish supplemental jurisdiction over Van Matre's negligence claims against Muncie Housing Authority. Those claims are therefore **dismissed without prejudice** for lack of jurisdiction, and Muncie Housing Authority's Motion for Summary Judgment is **denied as moot,** with the understanding that Van Matre may pursue her negligence claim in state court.

## IV.    CONCLUSION

For the reasons explained in this Order, the United States' Motion to Dismiss and Alternative Motion for Summary Judgment (Filing No. 62) is **GRANTED**, and Van Matre's claims against the United States are **DISMISSED without prejudice** for lack of subject matter

jurisdiction.[5] Van Matre's Motion for Summary Judgment (Filing No. 67) Plenty of Room's Cross-Motion for Summary Judgment (Filing No. 77), and Van Matre's Motion to Strike (Filing No. 80) are **DENIED as moot**.

The Court **relinquishes supplemental jurisdiction** over Van Matre's remaining negligence claims against the Muncie Housing Authority. Van Matre's claims against the Muncie Housing Authority are **DISMISSED without prejudice** for lack of subject matter jurisdiction, and the Muncie Housing Authority's Motion for Summary Judgment (Filing No. 65) is **DENIED as moot**.

Final judgment will issue under separate order.

**SO ORDERED**.

Date:    5/7/2026

Hon. Tanya Walton Pratt, Judge
United States District Court
Southern District of Indiana

Distribution:

Haroon Anwar
DOJ-Civ
haroon.anwar@usdoj.gov

David Douglas Becsey
ZEIGLER COHEN & KOCH
dbecsey@zcklaw.com

Michele Greif
DOJ-Civ
michele.greif@usdoj.gov

Roger K. Kanne
ZEIGLER COHEN & KOCH
rkanne@zcklaw.com

Matthew L. Kelsey
DEFUR VORAN LLP
mkelsey@defur.com

---

[5] A dismissal for lack of subject matter jurisdiction is not a decision on the merits and thus is without prejudice. *See Kowalski v. Boliker*, 893 F.3d 987, 994 (7th Cir. 2018) ("[A] dismissal for want of subject-matter jurisdiction is necessarily without prejudice").

25

Scott E. Shockley
DEFUR VORAN LLP
sshockley@defur.com

Christopher G. Stevenson
Ball Eggleston
cstevenson@ball-law.com